JOHNSON v JOHNSON

Docket No. 261919. Submitted October 11, 2006, at Detroit. Decided
June 7, 2007, at 9:00 a.m.

William D. Johnson brought a divorce action against Lillian B.
Johnson in the Wayne Circuit Court. The parties sought to have
the judge who was originally assigned to hear the case, Kathleen
M. McCarthy, J., make an initial ruling limited to whether the
separation had occurred in 1982 or 2000, but the visiting judge
who heard the case, Michael J. Talbot, J., in addition to ruling that
the parties separated in 2000, further ruled that the defendant was
entitled to half of the plaintiff's pension benefits for an 18-year
period, and instructed the parties that Judge McCarthy would
make a decision regarding spousal support while property-division
issues would be determined through arbitration. The case was
eventually heard by another visiting judge, John R. Kirwan, J.,
who ordered the property issues to be submitted to binding
arbitration and granted the defendant's motion to require asset
disclosure. When the plaintiff refused to participate in arbitration
on the ground that it encompassed issues that he had not agreed to
arbitrate, Judge McCarthy entered a default judgment of divorce,
and the plaintiff appealed.

The Court of Appeals *held*:

1. The trial court erred in entering a default judgment pre-
mised on the plaintiff's failure to participate in arbitration because
the plaintiff had not received the prearbitration disclosures that
are required by MCL 600.5072(1).

2. The court did not clearly err in determining that the parties'
date of separation was in the year 2000 on the basis of its
conclusion that the parties' children provided the most credible
testimony regarding that issue.

Affirmed in part and reversed in part.

O'CONNELL, J., concurring, wrote separately to emphasize the
restrictions that the Legislature placed on judges to protect
litigants from confusion and protect the court system from abuse,
explaining that the trial court in this case ordered the plaintiff to
forgo recourse to the courts, surrender his rights, and submit the

substance of his legal dispute to the discretion of an unknown, unelected, unappointed, and largely unaccountable third party without the benefit of the mandatory statutory safeguards; under these circumstances, the trial court's decision to enter a default rather than a less severe sanction for plaintiff's failure to follow the defective order resulted in manifest injustice that requires reversal.

Murray, P.J., concurring in part and dissenting in part, concurred with the majority's decision to affirm the judgment with regard to the parties' date of separation, but would have upheld the default judgment because, although there was a legitimate question regarding whether the court complied with the domestic relations arbitration act, parties are not entitled to ignore an order simply because they believe it is incorrect.

Divorce — Domestic Relations Arbitration Act — Default.

A court may not enter a default judgment against a party in a domestic relations action for failing to participate in arbitration if the party did not receive the prearbitration disclosures that are required by statute (MCL 600.5072[1]).

*Mbamah & Associates, P.C.* (by *Donald E. Mbamah*), for the plaintiff.

*Christopher J. Nesi* for the defendant.

Before: Murray, P.J., and O'Connell and Fort Hood, JJ.

Fort Hood, J. Plaintiff/counter-defendant appeals as of right from the trial court's order granting defendant/counter-plaintiff a default judgment of divorce.[1] We affirm in part and reverse in part.

Plaintiff and defendant were married in 1968 and resided in North Carolina for approximately 10 years before moving to Michigan. In 1978, defendant moved to Michigan with her six children, and plaintiff followed

---

[1] For ease of reference, we will use the term "plaintiff" to refer to plaintiff/counter-defendant and "defendant" to refer to defendant/counter-plaintiff.

a short time later. Defendant testified that she moved
here to start a new life because plaintiff was abusing
alcohol and had inappropriate relationships with other
women. Defendant testified that initially the couple's
relationship improved, but in 1982 she packed a suit-
case with plaintiff's clothing because of his continuing
inappropriate conduct.

The parties' testimony regarding the relationship
substantially diverged. Plaintiff testified that defendant
packed a suitcase with some of his belongings on two
occasions. On the first occasion, he simply moved back
into the marital home. However, on the second occasion,
he moved in with a friend. Plaintiff stayed with the
friend for approximately one year before moving into a
home owned by his girlfriend's mother. Plaintiff and his
girlfriend had a son during the course of the relation-
ship. Plaintiff testified that his family, including defen-
dant and his children with defendant, knew of his
ongoing relationship and the child from that relation-
ship. He asserted that defendant refused to file for
divorce because of her religious beliefs, but had no
objection to the filing of a petition by plaintiff. However,
plaintiff testified that he never "got around" to it.

Between 1982 and 2000, plaintiff worked as a fire-
fighter for a tank arsenal, stayed at the firehouse at
various times, and was promoted to chief. However, he
suffered from numerous health problems and, in 2000,
was admitted to the hospital for an amputation. During
this hospital stay, plaintiff asserted that defendant did
not express any concern for his condition and had filed
a claim for his benefits. This action purportedly served
as the basis for the filing of the petition for divorce.

On the contrary, defendant and some of her children
testified that plaintiff was living two lives with two
families and two homes. Defendant admitted that she

packed a suitcase for plaintiff, but he returned to the
marital home after a short separation. She testified that
he received his paycheck on a Thursday or Friday, but
would come home on Sunday without any funds to
support the family. Consequently, she filed a request for
aid from state agencies. Additionally, she testified that
plaintiff stayed at the marital home three to four nights
a week and explained any absences by stating that he
was working overtime. The couple ate meals together,
filed a joint tax return on two occasions, and took
vacations together. Marital relations continued until
one week before plaintiff's hospitalization.

Defendant testified that she learned of the existence
of plaintiff's illegitimate son when he was two years old.
She forgave defendant for the indiscretion, but testified
that she believed that the child was the product of a
"one night stand" and did not believe that the child's
mother had a continued presence in plaintiff's life.
Defendant testified that she learned of the relationship
between plaintiff and his mistress from a social worker
when defendant was hospitalized. Thereafter, defen-
dant refused to speak to plaintiff, but did not file for
divorce because she did not have the financial re-
sources. Although plaintiff helped defendant pay the
mortgage on the marital home before his hospitaliza-
tion, she testified that she was able to pay the mortgage
with the help of her children after she cut ties to
plaintiff.

The petition was assigned to a circuit court judge (the
first judge). On the date of trial, the case was heard by
a visiting judge (the second judge). The second judge
inquired whether the issue in the trial was the date of
separation and whether all issues would "fall into
place" once that question was decided. Defense counsel
indicated that the date of separation was not disposi-

tive, but was an important factor that the first judge would consider when resolving the case. When plaintiff's counsel sought to respond to that assertion, the second judge stated: "Apparently that's why you all can't working [sic] anything through here. You can't even agree on what the problem is. Let's just hear the witnesses, and I'll make decisions. Now you folks have absolutely lost control; now it's my decision." Counsel for each party then gave a brief opening statement that addressed the issue of the date of separation. Testimony at trial focused on whether plaintiff left the marital home in 1982, when defendant packed his suitcase, or whether the marital relationship continued until 2000, when defendant alleged that she discovered plaintiff's mistress.

After two days of testimony regarding the date of separation, the second judge denied plaintiff's request to present rebuttal witnesses or rebuttal testimony. The second judge also admonished the parties for failing to present evidence regarding the key issues necessary to resolve the divorce, such as property assets and valuations. Defense counsel stated that the parties sought a ruling regarding the date of separation and "then we go back and litigate the divorce." The second judge advised the parties that he was not bound by decisions rendered by the first judge and told the parties to produce written orders regarding the prior decision, stating:

> What's the matter with these lawyers did I just tell you. You're not going to go walking out here today and say we'll see you some day in the future. This is over with. So I'm not sure where you're going from here. This is the trial. This isn't a piece of a trial. . . . Courts speak through their orders. Show me any orders. I don't know what you're going to do. I couldn't figure what you were up to from the beginning. And I didn't hear any competent evidence about anything else. All I've heard is you got a house with a

mortgage on it and you got a pension. . . . There's nothing
to ask [the first judge]. Courts speak through their orders.
I don't understand what's been going on and I've been
waiting to hear testimony about the rest of the property in
this case. And nobody, neither one of you, presents any
competent evidence on the rest of it. I don't get that at all.

Now both of you are exposed; it isn't a one-sided
exposure. It's the simplest thing [in] the world to say I
know how to deal with that. So my suggestion is both of
you, running some rather interesting bits of exposure, had
best talk to each other. But if you don't want to, you don't
have to. I'll deal with it. . . . I told you [that] you need to
work this problem through. One of you would run a
risk—the court's ruled. You just got a ruling. I will also
suggest as to the balance I'm inclined to split 50/50. You
may want to meet and talk over the balance of your
problems and [I] invite everyone to be back here nine
o'clock tomorrow morning.

The second judge rendered a ruling with regard to
the proofs submitted. This ruling expressly held that
the testimony of the couple's children was credible and
that plaintiff led two lives with two separate families.
Consequently, the date of separation was the year 2000,
at the time of plaintiff's hospitalization. The second
judge further held that this ruling entitled defendant to
half of plaintiff's pension for the 18-year period.

The next day, the parties reported to the second judge
that they would proceed to binding arbitration. The
ruling regarding the date of separation and the pension
would "stand." The parties indicated that the first
judge held that the issue of spousal support was "off the
table." The parties agreed to file a motion before the
first judge to determine if that issue remained fore-
closed. The second judge indicated that he would take
proofs that there was a breakdown in the marital
relationship, and that the division of assets was re-

served for binding arbitration. The only instruction provided to the parties by the second trial judge was the following:

> Both of you folks understand that what the lawyers have said, and they have put a lot of time in with you, I'm sure, this afternoon, is that the balance of the items that are at issue, and this isn't a decision one way or the item [sic], but a couple of houses, the possibility of alimony or not, what they used to call alimony, spousal support, that needs to be straightened out with [the first judge]. Property down South, I think, in the Carolinas. I may be missing something, but those are the things that are now—they're all property issues, and they're all going to go to an arbitrator who will be the final word, whatever he or she decides, that it will go no further.

The case was not returned to the first judge. Rather, another visiting judge, the third judge, presided over the case and entered a written order providing that the division of the balance of the marital property was submitted to binding arbitration with each party responsible for half the fee. Although discovery had closed and trial had occurred, the third judge also granted a motion by defendant to require asset disclosure. Both parties were to complete an asset-disclosure form available from the first judge and submit it for arbitration. When the time for arbitration arrived, plaintiff refused to participate, alleging that it encompassed issues to which he had not agreed. Plaintiff also requested a new trial. The motion for new trial was denied, and a default judgment of divorce was entered by the first judge after plaintiff refused to participate in the arbitration. Plaintiff appeals as of right.

In the present case, domestic-relations arbitration is governed by statute. Issues of statutory construction present questions of law that are reviewed de novo. *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 594;

648 NW2d 591 (2002). The goal of statutory construction is to discern and give effect to the intent of the Legislature by examining the most reliable evidence of its intent—the words of the statute. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). If the statutory language is unambiguous, appellate courts presume that the Legislature intended the plainly expressed meaning, and judicial construction is neither permitted nor required. *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000). Under the plain-meaning rule, "courts should give the ordinary and accepted meaning to the mandatory word 'shall' and the permissive word 'may' unless to do so would clearly frustrate legislative intent as evidenced by other statutory language or by reading the statute as a whole." *Browder v Int'l Fidelity Ins Co*, 413 Mich 603, 612; 321 NW2d 668 (1982).

MCL 600.5072 governs domestic relations arbitration and provides, in relevant part:

> (1) The court shall not order a party to participate in arbitration unless each party to the domestic relations matter acknowledges, in writing or on the record, that he or she has been informed in plain language of all of the following:
>
> (a) Arbitration is voluntary.
>
> (b) Arbitration is binding and the right of appeal is limited.
>
> (c) Arbitration is not recommended for cases involving domestic violence.
>
> (d) Arbitration may not be appropriate in all cases.
>
> (e) The arbitrator's powers and duties are delineated in a written arbitration agreement that all parties must sign before arbitration commences.
>
> (f) During arbitration, the arbitrator has the power to decide each issue assigned to arbitration under the arbitra-

tion agreement. The court will, however, enforce the arbitrator's decisions on those issues.

(g) The party may consult with an attorney before entering into the arbitration process or may choose to be represented by an attorney throughout the entire process.

(h) If the party cannot afford an attorney, the party may wish to seek free legal services, which may or may not be available.

(i) A party to arbitration will be responsible, either solely or jointly with other parties, to pay for the cost of the arbitration, including fees for the arbitrator's services. In comparison, a party does not pay for the court to hear and decide an issue, except for payment of filing and other court fees prescribed by statute or court rule for which the party is responsible regardless of the use of arbitration.

"The domestic relations arbitration act permits parties to agree to binding arbitration of . . . disputes. It contains numerous protections for them, including mandatory prearbitration disclosures and detailed procedural requirements. MCL 600.5072." *Harvey v Harvey*, 470 Mich 186, 189; 680 NW2d 835 (2004).

MCL 600.5072(1) provides that the trial court "shall" not order a party to participate in arbitration unless there is an acknowledgment on the record or in writing that the party was informed of the following: the submission to arbitration is voluntary, the outcome of the arbitration will be binding and appellate review is limited, and arbitration is not recommended for domestic violence and may not be appropriate in other domestic cases. MCL 600.5072(1)(a)-(d). Additionally, the court must inform the parties in plain language of the arbitrator's powers and duties, the court's enforcement of the decisions rendered by the arbitrator, the option to consult with an attorney before entering into or during arbitration, the possibility of free legal services for arbitration, and the cost of arbitration as contrasted

with court resolution, which does not have an addi-
tional fee requirement. MCL 600.5072(e)-(i). Because
the statute uses the mandatory term "shall," the pro-
tections set forth in the statute are mandatory prearbi-
tration disclosures delineating the procedural require-
ments for voluntary submission to binding arbitration.
*Harvey, supra*; *Browder, supra.*

A review of the record reveals that the mandatory
prearbitration disclosures were not satisfied. On the
record, the second judge advised the parties that the
property issues were being submitted to the arbitrator
and that the decision would be the final word. This
statement failed to apprise the parties that appellate
review was available but limited. Moreover, it is unclear
if the agreement to arbitrate delineated the fact that
spousal support or alimony was held in reserve for the
first judge to resolve. The written and oral statements
did not indicate that the arbitration was voluntary, and
in light of the trial court's admonishment to the parties
that the case would be resolved the next day, it is
unclear if the decision to arbitrate was voluntary. Fur-
ther, the second judge did not advise the parties that the
fee for arbitration was unnecessary if they elected to
have the court resolve the matter. Under these circum-
stances, the first judge erred in allowing the default
judgment premised on plaintiff's failure to participate
in arbitration when he was not advised of the statutory
criteria for voluntary submission.

Plaintiff next alleges that the trial court erred in
determining that the date of separation was in the year
2000 when the great weight of the evidence did not
support that factual finding. I disagree. The trial court's
factual findings in a divorce case are reviewed for clear
error. *Beason v Beason*, 435 Mich 791, 805; 460 NW2d
207 (1990). A finding is clearly erroneous if the review-

ing court is left with a definite and firm conviction that a mistake has been made after reviewing all the evidence. *Id*. Although this standard is less rigorous than the standard applied to a jury determination, it does not authorize the reviewing court to substitute its judgment for that of the trial court. *Id*. "This Court gives special deference to a trial court's findings when they are based on the credibility of the witnesses." *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997).

A review of the record reveals that the trial court's factual findings were not against the great weight of the evidence. The second judge was presented with two diametrically opposed versions of events. Plaintiff and his witnesses alleged that he had separated from defendant in 1982 and that his family was aware of his relationship with his girlfriend and their child. On the contrary, defendant and her witnesses, including the parties' children, testified that plaintiff continued to reside at the marital home on a part-time basis and attributed his absence from the home to his work schedule. Because of the nature of his employment as a firefighter and later as chief, it was plausible that plaintiff would be required to remain at work beyond normal work hours. The defense asserted that the child was not hidden, but the continued relationship with plaintiff's mistress was not disclosed. Rather, it was asserted that plaintiff indicated that the child was the product of a one-night stand and that he did not have a continuing relationship with the child's mother. The second judge assessed the credibility of the witnesses and concluded that the testimony presented by the children of the parties was to be believed. Under the circumstances, it cannot be concluded that the factual finding regarding the date of separation was clearly erroneous. *Beason, supra*.

Plaintiff alleges two additional issues regarding the determination of value of the marital assets and whether the final judgment was equitable. The conclusion that the default judgment must be set aside in light of the noncompliance with MCL 600.5072 renders these issues moot.[2]

Affirmed in part and reversed in part. Jurisdiction is not retained.

O'CONNELL, J. *(concurring)*. I concur with the lead opinion. I write separately to emphasize the restrictions that our Legislature has placed on judges to protect litigants from confusion and protect the court system from abuse. Even before the recent drafting of the domestic relations arbitration act (DRAA), MCL 600.5070 *et seq.*, judges had no authority to order a party to submit a domestic relations matter to arbitration and, instead, the court could only mandate arbitra-

---

[2] I agree with the second judge that the court speaks through its written orders. *In re Gazella*, 264 Mich App 668, 677; 692 NW2d 708 (2005). Furthermore, the circuit court is bound to follow the published decisions of the Court of Appeals and the Michigan Supreme Court. *People v Hunt*, 171 Mich App 174, 180; 429 NW2d 824 (1988). There is no requirement that a circuit judge follow the decision of another. *Id.* If the first judge agreed to allow the parties to bifurcate the trial and to decide the issue of the date of separation in a separate hearing, a written order to that effect should have been entered and would have guided the second judge with regard to the nature of the trial when the parties could not agree on the first judge's preliminary ruling. Moreover, although it appeared that discovery had closed, there did not appear to be any indication that the parties could have proceeded to address assets and valuation, particularly in light of the fact that a motion to disclose assets was filed after the trial regarding the date of separation. It is imperative that the rule regarding written orders be followed to allow a visiting judge to step in and handle matters in place of the original trial judge. Moreover, the first judge should have made clear whether discovery was extended in light of the bifurcation of the issues at trial. If discovery had been completed and written orders regarding the posture of the case had issued, the procedural irregularity in this case arguably would have been avoided.

tion in accordance with an express written stipulation of
the parties. See *Balabuch v Balabuch*, 199 Mich App 661,
662; 502 NW2d 381 (1993); *Marvin v Marvin*, 203 Mich
App 154, 156-157; 511 NW2d 708 (1993). If the parties
failed to put their agreement to arbitrate in writing, or
failed to acknowledge their intent that a circuit court may
enforce the arbitrator's award, then the agreement would
not fall within the Michigan arbitration act, MCL
600.5001 *et seq.*, and the agreement to arbitrate would be
revocable by the unilateral act of either party until the
arbitrator issued a judgment. *Wold Architects & Engineers v Strat*, 474 Mich 223, 234-237; 713 NW2d 750
(2006); cf. MCL 600.5001(1), MCL 600.5011.

Now MCL 600.5072(1) states, "The court shall not
order a party to participate in arbitration unless each
party to the domestic relations matter acknowledges, in
writing or on the record, that he or she has been
informed in plain language" of a litany of rights and
conditions, including the right to go to trial, the limited
ability to appeal a decision, and the requirement that
the parties must have signed a written arbitration
agreement spelling out the arbitrator's authority and
obligations. The parties concede that the trial court
neglected to notify the litigants of the nine distinct
rights enumerated in MCL 600.5072(1), and neither
side has presented any written arbitration agreement
spelling out the arbitrator's "powers and duties." MCL
600.5072(1)(e). In fact, it was an unresolved dispute
over the arbitrator's authority that led plaintiff to
withdraw his consent to arbitrate on the record and
within moments after the trial court accepted the
representations of the parties' attorneys that they
would arbitrate certain property issues.[1] The trial

---

[1] Although another judge had provided some explanation about the
arbitration process to plaintiff in an earlier proceeding, it does not appear

court's failure to comply with the mandatory procedure outlined in the statute meant that it unquestionably erred when it ordered the case to arbitration.

The dissent concludes that even if the trial court failed to comply with the DRAA, a default can be entered because plaintiff disobeyed the court's order to participate in arbitration. Under the peculiar facts of this case, I respectfully disagree. This was not a case in which a party was required to forfeit money pending appeal, or even leave a cloud on a title to property until an appellate court could sort out the trial court's mistake. In this case, plaintiff was ordered to forgo recourse to our primary institution of justice, surrender his rights, and submit the substance of his legal dispute to the discretion of an unknown, unelected, unappointed, and largely unaccountable third party. Although our courts have always respected a party's consent or contractual freedom to take a more streamlined approach to dispute resolution, they have never shirked their constitutional duty by requiring litigation in an alternative, unofficial forum. Moreover, our laws have always recognized that unwritten agreements to arbitrate are unilaterally revocable, so that a party who feels delayed remorse over an oral acquiescence to submit to arbitration may always safely retreat to the courts. *Wold Architects, supra.*

Domestic relations necessarily involve personal, rather than pecuniary, issues, so our legal system has been especially slow to sanction extrajudicial resolution of any of these matters, even when founded on the parties' mutual assent. Recently, the Legislature overcame this persistent reluctance by instituting simple statutory safeguards, including informed, unequivocal, and written assent to the arbitration process. MCL

that he was even present when a later judge signed the order requiring the parties to submit to arbitration.

600.5072(1). That assent to the waiver of each right and
the acknowledgment of the governing written instrument must be reflected on the record. This was not done
here. To ignore the mandatory nature of the statute
leaves plaintiff, and those like him, with an irremediable error. According to the dissent, plaintiff was required to submit the matter to arbitration and prepare
to file an appeal after the trial court confirmed the
arbitrator's judgment.[2] After successfully appealing, he
could, perhaps, return to court to get the full and
complete trial he should have received years earlier.[3]
Adopting the dissent's approach ignores plaintiff's unilateral right to withdraw from arbitration, allows a
court to sanction a party by compounding the party's
proceedings and litigation expenses, and fails to acknowledge any restriction on the trial court's authority
to mandate arbitration in a divorce case. This complication of the process invites delay and other abuses of
the system, and the trial court's entanglement in this
case exemplifies why courts should simply adhere to the
plain and unambiguous language in the statute.

---

[2] I agree with the dissent that a party disobeys a court order at his or
her peril, but I also note that statutes are no less deserving of obedience.
Moreover, a trial court generally has less draconian measures available
for enforcing its orders than default, and "a trial court abuses its
discretion by employing default as a sanction without determining, on
the record, whether less drastic alternative sanctions are appropriate."
*Gawlik v Rengachary*, 270 Mich App 1, 9; 714 NW2d 386 (2006). In my
opinion, the default entered in this case was not an appropriate sanction
for plaintiff's failure to adhere to the trial court's erroneous order, and
the trial court's failure to consider any other sanction on the record
forecloses further consideration of the issue.

[3] Divorce cases are not supposed to be resolved piecemeal, see *Dobrzenski v Dobrzenski*, 208 Mich App 514, 515-516; 528 NW2d 827 (1995), and
MCR 3.211(B), and we generally oppose splitting adjudicative responsibilities between a court and an arbitrator as the trial court did in this
case. See *Fromm v MEEMIC Ins Co*, 264 Mich App 302, 306-307; 690
NW2d 528 (2004).

Rather than encourage confusion, sloppiness, and abuse, we must enforce the statute as written and place plaintiff in the position he would have been in if the error had not occurred: before a trial court, prepared to adjudicate his legal rights. Our court rules reiterate these principles. They require a court to excuse a party's failure to attend an alternative dispute resolution hearing and refrain from entering a default order if the court finds that entering a default order would cause manifest injustice. MCR 2.410(D)(3)(b)(i). In this case, it was manifest injustice for the court to rule plaintiff in default for his failure to follow the statutorily defective and otherwise infirm order, but the trial court did not consider any other sanction on the record. *Gawlik v Rengachary*, 270 Mich App 1, 9; 714 NW2d 386 (2006). This error alone requires reversal. *Id.* Although I agree with the dissenting opinion that the delay caused by plaintiff's indecisiveness or gamesmanship warrants some sanction, perhaps for defendant's costs, default was not a self-evident resolution to this matter. Therefore, I concur with the lead opinion's resolution of this case.

MURRAY, P.J. (*concurring in part and dissenting in part*). I concur with the majority's decision to affirm the trial court's judgment with respect to the parties' date of separation, because the trial court's findings of fact were not clearly erroneous. However, I dissent from the majority's reversal of the trial court's entry of a default judgment of divorce against plaintiff because, regardless of whether the order sending the parties to arbitration was erroneous, a default was properly entered against plaintiff for failing to appear at the arbitration.

This case has a tortured history in the trial court. Three different judges handled different aspects of the case, and at least one of the parties had more than one

attorney during the trial court proceedings. Additionally, this was a contentious divorce with different views on how the parties lived. However, after sifting through the record, it appears that the following facts and procedures are undisputed, and require affirming the default judgment.

After a short bench trial, at which the trial court determined the date of separation and ordered that the parties share equally in any pension benefits, the parties agreed on September 3, 2004, to submit their property issues to binding arbitration on November 1, 2004. Their agreement was embodied in an October 15, 2004, order for binding arbitration, which provided that

> the parties agree to submit to binding arbitration in regards to the division of the balance of the marital property. Arbitration shall be conducted by, if at all possible, Garber and Mayers, PC. The parties shall each pay half of the fee required for the arbitration. The issue of alimony is preserved pending future ruling of the court, as expressed in the previous order entered September 3, 2004.[1]

Prior to the November 1, 2004, arbitration, the parties filed motions in the trial court regarding the compelling of asset disclosures (defendant's motion) and a motion for reconsideration of the order regarding arbitration (plaintiff's motion). Specifically, on October 15, 2004, the court entered an order granting the defendant's motion to compel asset disclosure, which required both parties to complete asset disclosure forms and required the form to be completed and submitted to the opposing party and the arbitrator by October 22, 2004. The court

---

[1] Curiously, a second order, denoted "7-Day Order following trial," was also entered on October 15, 2004. That order, which was also submitted by defense counsel, stated that "the parties' consent to proceed to binding arbitration under division of the balance of the marital property, the court will withhold further ruling on property division."

also ordered that "binding arbitration shall take place on November 1, 2004 at 9 a.m. at the office of Garber and Mayers."

Thereafter, on October 24, 2004, the parties appeared before the trial court to address certain matters. The first issue addressed was whether the trial court had previously ruled that spousal support would be barred. After the trial court concluded that spousal support was at issue, the trial court considered plaintiff's motion for reconsideration or a new trial. The basis of that motion was plaintiff's contention that the trial court had erred in making any determination regarding property during the trial (as noted, the trial court concluded that any pension benefits would be split equally) without making findings of fact or evaluating the proper factors for property division.

At oral argument on the motion, plaintiff's counsel objected to going forward with the arbitration because plaintiff thought that the arbitration was going to cover property that was not specifically discussed at the trial. Specifically, plaintiff's counsel asserted that because the trial court had mentioned certain properties when the parties placed their arbitration agreement on the record, the arbitration should be limited only to those specific properties. Since it appeared to plaintiff that the arbitration was going to involve all the parties' property, plaintiff asserted that he should not have to proceed with the arbitration. The court rejected this proposition in clear and unequivocal terms:

> The transcript is clear. That's your transcript. You didn't put any objections on it then, I'm not granting your motion for reconsideration. *I am adopting and enforcing the court order ordering you to go to arbitration on November 1. If you choose not to go to arbitration on November 1, you do so at your own peril.*

> This court has the authority and will maintain its authority to have judgments entered in all manners (sic) before it. I am scheduling a review hearing to ensure that the arbitration proceeded and that I have an arbitration and judgment in conformity therewith for December— Monday, December 6.

Consequently, it was abundantly clear to plaintiff—or at least it should have been—that there had been two orders entered confirming that the arbitration was to take place on November 1, and the trial court confirmed it again on the record on October 29, 2004, when denying plaintiff's motion for reconsideration or a new trial.

The majority concludes that the default judgment should be reversed because the agreement to arbitrate was not in sufficient compliance with the domestic relations arbitration act (DRAA), MCL 600.5070 *et seq.* Although there is certainly a legitimate question regarding whether there was compliance with that act, the default judgment should nevertheless be upheld because parties are not entitled to ignore, or not comply with, an order entered by a trial court simply because they believe it is an incorrect order. We said as much in *In re Contempt of Dudzinski*, 257 Mich App 96, 110; 667 NW2d 68 (2003), where we held, quoting *Kirby v Michigan High School Athletic Ass'n*, 459 Mich 23, 40; 585 NW2d 290 (1998), that " '[a] party must obey an order entered by a court with proper jurisdiction, even if the order is clearly incorrect, or the party must face the risk of being held in contempt and possibly being ordered to comply with the order at a later date.' " As we held in *In re Dudzinski*, a party is not entitled to ignore or disobey a court order simply on the belief that the order was invalid and would be overturned on appeal:

> Civil disobedience is not the appropriate course of action when a person disagrees with a court order. We are a society of laws and the legal remedy available to appellant was to seek leave to appeal the trial court's order precluding him from wearing his shirt. Appellant elected not to pursue his legal remedy, and instead elected to willfully disobey a valid albeit erroneous court order. A person may not disregard a court order simply on the basis of his subjective view that the order is wrong or will be declared invalid on appeal. Allowing such behavior would encourage noncompliance with valid court orders on the basis of misguided subjective views that the orders are wrong. There exists no place in our justice system for self-help. [*In re Dudzinski, supra* at 111.]

In this case, that is exactly what plaintiff did. Plaintiff was repeatedly ordered to attend the November 1, 2004, arbitration, but refused to go forward with the arbitration on the basis that it was going to address property issues that were not, in his belief, supposed to be covered under the arbitration order. But because plaintiff cannot subjectively determine whether or not to comply with an order, and especially because the trial court had ruled just days before that plaintiff's arguments in this regard were without merit, plaintiff acted "at his own peril" in refusing to comply with the orders and refusing to engage in the arbitration proceedings. Since plaintiff willfully failed to comply with the trial court's order compelling arbitration, a default was properly entered against plaintiff. See *Citizens Ins Co of America v Juno Lighting, Inc*, 247 Mich App 236, 244-245; 635 NW2d 379 (2001). If plaintiff would have attended the arbitration, and then appealed to this Court any judgment entered on the arbitration decision and the prior order compelling arbitration, then in my view this case would be as the majority views it. However, as noted, plaintiff did not follow the correct procedures and willfully disobeyed the orders compel-

ling arbitration, and has now suffered the consequence of a properly entered default.[2]

---

[2] The concurrence's views in this case are perplexing. On the one hand, the concurrence exalts the attributes of the DRAA, but then indicates a fear of submitting domestic relations matters to the discretion of an "unknown, unelected, unappointed, and largely unaccountable third party." Yet it is this same DRAA that (1) gives these "unaccountable third parties" a great deal of discretion to decide domestic relations issues, (2) sets forth specific criteria for an attorney to be eligible to be an arbitrator, MCL 600.5073(2), and (3) grants significant power to conduct quasi-judicial proceedings, MCL 600.5074, all of which occurs with only limited review by the courts. MCL 600.5081. Additionally, the concurrence indicates agreement with my view that a party who disregards a court order acts at his own peril, but then remarks that statutes are also entitled to obedience. A true enough point, but a largely irrelevant one unless our judicial system now gives the party to a case the discretion to decide whether the order or statute was correct and therefore to be followed. But, of course, it does not. Rather, it is the judiciary that decides what the statute says, *Marbury v Madison*, 5 US (1 Cranch) 137, 177 (1803), and how it applies to the case before it. Sometimes, as in this case, parties are faced with having to comply with an order they disagree with, but the answer is to follow the proper procedures outlined in the law for seeking relief through the courts, not to disregard the trial court's order. *In re Dudzinski, supra.* The concurrence's view, which seems to draw exceptions to this fundamental rule depending on what is at stake in the case, would only encourage "gamesmanship" and would not preserve our system of justice. *Ward v Siano*, 272 Mich App 715, 721 n 2; 730 NW2d 1 (2006) (O'CONNELL, J., concurring). See, also, *United States v Armstrong*, 781 F2d 700, 707 n 4 (CA 9, 1986) ("If everyone was free to disobey lawful court orders until the orders were ratified by some other tribunal, the result would be anarchy and disorder.").