*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SANDY JIJIKA,

Plaintiff-Appellee,

v

OLIVER JIJIKA,

Defendant-Appellant.

UNPUBLISHED
August 19, 2025
11:35 AM

No. 369503
Macomb Circuit Court
LC No. 2022-011229-DM

Before: BORRELLO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

PER CURIAM.

Defendant, Oliver Jijika, appeals as of right the judgment of divorce that ended his marriage to plaintiff, Sandy Jijika.[1] On appeal, Oliver challenges the provisions within the judgment that relate to the distribution of the marital property. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

The parties first met in 2007 in Iraq. At that time, Oliver had a bachelor's degree in engineering and, because he was looking for a wife, he approached Sandy's mother and asked if he could marry Sandy. Sandy's mother agreed to the arrangement, and the parties married in 2009 in Iraq. While the parties resided in Iraq, Sandy earned a bachelor's degree in biology and the parties had two children. In 2013, they moved to the United States with help from Oliver's brother. For a few months, they resided with him in Georgia before they moved to Michigan and purchased a house.

The parties had two more children while they were in Michigan. Oliver was able to support the family with his employment. Throughout the marriage, he worked as an engineer for a few companies. And at the time of the divorce trial, he was working as an engineer at Ford Motor

---

[1] Sandy testified through an interpreter at trial. Oliver was offered the use of an interpreter, but declined.

Company and was working toward getting a master's degree in engineering from Wayne State University. Oliver testified that he made $112,000 in 2022 and was on track to earn $108,000 in 2023. In contrast, Sandy's role in the marriage was to care for the parties' children. Although she worked outside of the home at times as a substitute teacher, the money she earned was negligible. In 2022, for example, she earned $2,000, and she had not earned any money in 2023. Unlike Oliver, who was able to use his engineering degree, Sandy was unable to use her biology degree in the United States. Further, despite earning a pharmacy technician certificate and receiving some training at a pharmacy, Sandy remained unlicensed to actually work in that field.

Domestic violence was an ongoing issue in the marriage. According to Sandy, Oliver first hit her in 2010. She did not report his abuse because she did not feel that the law in Iraq would protect her. The abuse continued when the parties lived in the United States. Sandy recounted that Oliver would hit her "all the time," sometimes while their children were present and sometimes while the children were asleep. She called the police for the first time in 2016. Oliver was arrested and spent two nights in jail. Sandy stated, however, that she did not have the "proper language" to follow up and so the matter was dropped. Sandy next called the police in May 2018. Oliver was not arrested on that occasion because he convinced the police that she was just stressed because she had recently given birth.

Additional incidents occurred in August 2021. Sandy testified that she first called the police from her children's school, but that they did not help her because the abuse had occurred three days earlier. Sandy decided that she would leave the house and go to the shelter. Oliver, however, dragged her from the vehicle. A neighbor called the police and Oliver was again arrested. After that incident, Oliver talked with the parties' priest, who then tried to reconcile the parties. Additionally, Oliver's sister and one of his friends called to discuss the matter with her. Sandy testified that she was confused, fearful, felt that she had no support, and was afraid of being on her own. Eventually, Oliver signed and notarized a document stating that he would give Sandy $100,000 to pay off a debt to Sandy's sister and that Sandy would drop her claims against him.[2] Oliver testified that he signed the document to make Sandy happy, not to make the criminal charges he was facing go away. Thereafter, Sandy deposited approximately $110,000 of the parties' money into an account that was in her name only.

Later, Oliver was removed from the marital house in handcuffs as a result of another domestic violence incident, and Sandy filed for divorce. Prior to the divorce trial, Oliver was convicted following a jury trial of two counts of domestic violence and he entered a no-contest plea to a misdemeanor stalking charge in exchange for the prosecution dropping a felony misdemeanor charge. Oliver also violated a (Personal Protection Order) PPO that had been entered against him. Despite the convictions, Oliver insisted at trial he was "the victim," not Sandy. He claimed that she would push him and that she had spat on him on several occasions, including once where she spat on him from her vehicle while he was in his vehicle.

For his part, Oliver also called the police on Sandy multiple times. First, the week before the trial, Oliver called the police on Sandy because he felt that the children were unsafe in her care after they missed a phone call. Two days before trial, the children missed another phone call.

---

[2] The parties agreed that there was no debt owed to Sandy's sister.

Oliver waited a day and then called the police on Sandy to perform a wellness check. He admitted that he and Sandy were at the courthouse when he made that call. Next, Oliver testified that during parenting time, he observed a mark on one of the children's necks. The child supposedly reported to him that a knife had been held to his neck. Oliver waited a few days and then reported the incident to the police. Child Protective Services (CPS) contacted him as a result of the report, but no one was arrested and it does not appear that CPS took any action. Additionally, he testified that he called 9-1-1 on Sandy because she allegedly pointed a gun at him from her vehicle two days before the start of the divorce trial. He admitted that, although he worked and lived in Sterling Heights, the incident occurred in Macomb Township on a road that was a few miles from the marital home where Sandy and the children were residing. Further, he admitted (after initially denying it) that the day before the divorce trial started, he went to the PPO office at the court to inquire whether he could obtain a PPO against Sandy. Finally, before the second day of the divorce trial, Oliver called the police to report that, a few days earlier, he saw a slap mark on one of the children. He also suggested that, based upon the children's answers to his questions regarding their mother's household, the children were not being provided with food and water while in Sandy's care. He reported the incident a few days later. He justified the delay by explaining that he had been working.

As it relates to the marital estate, the parties owned two houses in Michigan and a piece of property in Iraq. They owned two 2022 Ford Explorers. They also had a few joint and individual bank accounts. The value of the assets was not disputed at trial. In contrast, there were disputes regarding the parties' debts. Specifically, Oliver presented documentation in support of his claim that the parties owed a significant amount of money to his brother, his cousin, and a friend. Each "loan" was memorialized in documents that were signed by Oliver two days before the start of the divorce trial.

Some of the loans were, according to Oliver, used to make down payments on houses that the parties purchased during the marriage. The oldest and largest was a loan for $28,000 from Oliver's brother in 2013.[3] Oliver stated the money was used to purchase the parties' first house in Michigan. Sandy, however, testified that there was no loan. She explained that the parties had brought cash with them from Iraq and that the money had been deposited in Oliver's brother's account and then returned to them in the form of a check. Oliver and his brother testified that the parties borrowed $9,000 to purchase the marital house in 2016. They both testified that they represented to the bank that was processing the mortgage application that the $9,000 was a gift.

The remaining loans—totaling thousands of dollars—were used to pay his attorney fees and legal expenses that were incurred in his criminal cases and in the divorce proceedings. Likewise, Oliver testified that the balance on his two credit cards was incurred when he paid his lawyers.

---

[3] The document acknowledging the loan was dated two days before trial, indicated that the money was loaned in 2016, and stated that the amount borrowed was $2,800. Oliver claimed that the date of the loan and the amount was incorrectly listed.

Following the trial, the court entered a written opinion and order detailing its findings related to child custody, property distribution, and attorney fees. This appeal challenging the court's property distribution follows.

## II. PROPERTY DISTRIBUTION

### A. STANDARD OF REVIEW

"In a divorce action, this Court reviews for clear error a trial court's factual findings on the division of marital property . . . ." *Hodge v Parks*, 303 Mich App 552, 554; 844 NW2d 189 (2014). "Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made." *Id*. at 555 (quotation marks and citations omitted). "The trial court's factual findings are accorded substantial deference." *Berger v Berger*, 277 Mich App 700, 717; 747 NW2d 336 (2008). If the court's factual findings are upheld, we must "decide whether the dispositive ruling was fair and equitable in light of those facts." *Sparks v Sparks*, 440 Mich 141, 151; 485 NW2d 893 (1992). The property distribution should be upheld "unless the appellate court is left with the definite and firm conviction that the division was inequitable." *Id*.

### B. ANALYSIS

Oliver first challenges the trial court's assessment of his credibility. We give "special deference to a trial court's findings when they are based on the credibility of the witness." *Johnson v Johnson*, 276 Mich App 1, 11; 739 NW2d 877 (2007) (quotation marks and citation omitted). This deference is afforded because the trial court is in the best position to view the demeanor of the witnesses when assessing their credibility. MCR 2.613(C); *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). In this case, the trial court had the opportunity to view Oliver's demeanor while he was testifying. The court found

> [Oliver] was a less than credible witness throughout his testimony. When not trying to avoid answering direct questions he often changed his answers. He denied matters that are part of the record in this matter and his criminal cases (particularly his four convictions). [Oliver] was also dismissive; he smirked and laughed during his testimony. He tried to deflect responsibility for his own legal transgressions, claiming to be the victim despite being convicted of repeatedly abusing and stalking [Sandy]. And, when all else was failed, [Oliver] outright lied in an attempt to downplay his own actions.

The court's findings are supported by the record, which reflects that Oliver often declined to directly answer questions and that he would testify to one version of events only to—sometimes immediately—testify to the exact opposite. His demeanor, which including "smiling" during his testimony was noted on the record by the trial court. Likewise, it is clear from the record that, notwithstanding that he had multiple convictions for domestic violence and a conviction of stalking, Oliver represented to the court that he was the "victim" and that he had never harmed Sandy.

Moreover, the court's finding that he outright lied was based upon three different circumstances. First, Oliver's testimony that he was never suicidal was contradicted by testimony from a police officer that responded to the report that Oliver was suicidal. Second, the court noted

Oliver's testimony that Sandy had recently spat while she was in her vehicle and he was in his vehicle. In finding that testimony untrue, the court noted that Sandy "would have to be a champion spitter to be driving her own vehicle and spit over her passenger seat through the open window and across the gap to [Oliver's] vehicle before hitting him inside his vehicle." Lastly, the court found that Oliver lied when he repeatedly called the police to report Sandy "as an unsafe mother and seeking welfare checks of the minor children, all because he did not receive his phone call."

The court determined that the repeated calls demonstrate "clear attempts to manipulate the system in his favor (especially given the long lapses of time between the incidents and when he actually called the police)." The trial court, sitting as the trier of fact, was free to find that Oliver was lying in relation to those incidents.

Still, Oliver contends that what the court characterized as evasiveness and lying was actually just the result of communication issues that arose because English is not Oliver's native language. He suggests that the record reflects that he never meant to avoid answering questions and that he was apologetic to the trial court when the court expressed frustration. The record does not support his assertion that his testimony was negatively impacted by a language barrier. The court noted that, at times, Oliver might not understand certain words or phrases, which would require the questions to be expanded upon or reexplained. The court believed the problem was that Oliver was not listening to the question and was instead trying to "tell his story" or to "paint himself in a better light than maybe he should be in certain circumstances." Nevertheless, the court offered Oliver the use of an interpreter if he so desired. Oliver stated unequivocally, "I don't need any translator." When asked if he was "sure," he stated, "Yes, I am." In its findings of fact, the court found that Oliver's "flip-flopping [in his testimony] was not due to any language barrier." Instead, the court found that "[h]e was able to understand English," had "declined the services of an interpreter on two occasions," and that he had also declined an interpreter "in all of his criminal matters."

Based upon the record in this case, and giving due regard to the court's special opportunity to view Oliver's demeanor when testifying, we conclude that the trial court did not clearly err by finding that Oliver's testimony was less than credible and that any difficulties in his testimony was not based upon a language barrier.

Next, Oliver challenges some of the court's factual findings related to the marital debt. He asserts that the court improperly ordered him to be responsible for a Chase Sapphire credit card, a Huntington Bank credit card, a $30,000 auto loan, a vehicle repair bill, and loans given to the parties for the purchase of marital property. We address each challenge in turn.

First, Oliver contends that the Chase Sapphire card and his Huntington Bank credit cards were used to make marital purchases. The court found no evidence that the balances were a marital debt. The record supports the court's finding. Oliver testified that he had last used his Chase credit card to pay one of his lawyers, and he stated that the remaining balance reflected what remained of his legal fees for three different lawyers. Oliver further testified that he used his Huntington bank credit card to pay attorney fees in connection with his criminal trial and his divorce case. He did not recall the balance on the account, but thought that it might be $2,000. Although Oliver now contends that support for the credit cards being used for marital purchases and that support for that assertion can be found in defendant's trial exhibits 27 and 28, the record

does not reflect that any such exhibits were admitted at trial. Given that the testimony supports the court's finding that the debt was for payment of Oliver's legal fees in his criminal cases and in his divorce case, the court did not err by finding that the debt was not marital debt and should be Oliver's sole responsibility.

Next, Oliver argues that his vehicle is subject to a $30,000 car loan, but that Sandy's vehicle is not subject to any loan amount. In support, he directs this Court to his Domestic Relations Verified Financial Information Form. In that document, he represented that there were two 2022 Ford Explorers titled in his name and that the debt on one was $30,000 and that the debt on the other was $0. No supporting documents reflecting the amounts owed, however, were submitted at trial. Moreover, it is unclear whether Oliver was awarded the vehicle with an alleged $30,000 loan balance or the other vehicle. At trial, he testified that he purchased two vehicles and that the balance on "[o]ne of them is $30,000." He did not specify that the balance was on his vehicle. In its findings of fact, the trial court found that there was no competent evidence presented as to the vehicles values or loan balances. Given the record in this case, that finding was not clearly erroneous.

Oliver further asserts that his $3,311 collision repair bill, which was for his vehicle, should have been divided equally as marital debt. A copy of the bill was admitted into evidence. The bill, which was dated December 14, 2022, indicates that a payment was made by insurance and on a credit card, but suggests that there is an outstanding balance of $3,311. That amount, however, is handwritten. The actual number reflected is not legible on the copy of the bill admitted as an exhibit. The trial court found that the age of the bill and the fact that payments had been made on it were sufficient to warrant disregarding the bill. We conclude that the court's factual findings related to the bill did not warrant outright disregarding it. The bill for services was dated approximately three months before the divorce trial. And the payments remitted did not total the entire stated amount of the bill. As a result, there is no reason to believe that the bill was satisfied. Nevertheless, given that the court's decision to award the parties the vehicles in their possession and the debts associated with them, the court's failure to divide the repair-bill debt on Oliver's vehicle, does not warrant reversal.

Next, Oliver contends that the trial court clearly erred by not dividing marital debts in the form of loans that the parties received when purchasing marital property. The trial court disallowed a large number of "loans" that Oliver purportedly received from his family and friends during the course of the marriage. In doing so, the court noted that each loan was memorialized a few days before trial. The court reasoned that collection on at least one of the loans appeared to be barred by the statute of limitations. Moreover, at least one loan of $9,000 to Oliver's brother had been characterized by Oliver's brother as a "gift" to support Oliver's mortgage application on a house. The court found that equity did not favor permitting the recharacterization of the gift as a loan. Further, although Oliver testified that a 2013 loan from his brother of $28,000 was used to purchase a condo in 2013, Sandy testified that the condo was not purchased with a loan from Oliver's brother. Instead, she stated that the parties had brought cash from Iraq, which was deposited in Oliver's brother's account and redistributed to them in the form of a check. In light of the record in this case, and giving due deference to the court's credibility determinations, we conclude that the trial court did not clearly err by finding invalid the alleged loans to Oliver's family for the purchase of the parties marital house and investment properties.

-6-

Additionally, the trial court further found that the more recent loans identified by Oliver were purportedly used to pay Oliver's attorney fees and costs in connection with the divorce and with his criminal cases related to his domestic abuse and stalking of Sandy. The court, however, found that the amount allegedly borrowed surpassed the amount of attorney fees and costs accumulated by Oliver. Considering the circumstances of the so-called loans as a whole, we conclude that the trial court did not clearly err by finding that the loans were "fabricated" and amounted to a "brazen attempt to influence the property settlement."

In conclusion, the trial court did not clearly err by finding that the credit card debt was not marital debt because it was used to pay Oliver's attorney fees and legal costs in his criminal cases and in the divorce proceedings. The court's decision to award the parties the debts associated with their respective vehicles was not clearly erroneous given that no evidence was admitted to establish the value of the vehicles and the amount of debt owed on the vehicle awarded to Oliver. The court's finding that the loans for the purchase of various properties and that the loans for the payment of Oliver's legal fees were fabricated was, likewise, not clearly erroneous.

Lastly, Oliver argues that the trial court's property division is inequitable and was based upon the court's disproportionate consideration of his fault in causing the breakdown of the marital relationship. The court awarded Sandy $208,989.01 and awarded Oliver $155,445.64, which is roughly a 57/43 division of the marital assets in favor of Sandy.

"The goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances." *Berger*, 277 Mich App at 716-717. There is no need to "divide the marital estate into mathematically equal portions, but any significant departure from congruence must be clearly explained." *Id.* at 717. "To reach an equitable division of marital property, a trial court should consider the duration of the marriage, the contribution of each party to the marital estate, each party's station in life, each party's earning ability, each party's age, health and needs, fault or past misconduct, and any other equitable circumstance." *Woodington v Shokoohi*, 288 Mich App 352, 363; 792 NW2d 63 (2010). "The determination of relevant factors will vary with the circumstances of each case, and no one factor should be given undue weight." *Id*.

Here, the trial court found that the parties were married for 14 years. Oliver was 42 years of age and Sandy was 34 years of age. Both had good physical health and, although Oliver had some mental-health issues, they did not impact his ability to remain gainfully employed. The court further determined that both parties were responsible for the dissipation of the marital estate.

On appeal, Oliver suggests that the parties have equal earnings capacities based upon the fact that they are both educated and have worked outside the home. He contends that, as a result, the present disparity in the parties income should not be used to justify an unequal division of the marital assets. In support, he directs this Court to *Berger*, where the trial court found that the defendant "earned substantially more a year than [the] plaintiff ($120,000 versus $22,000). *Berger*, 277 Mich App at 719-720. The *Berger* Court, however, found that the disparity was a "misleading reflection of the parties' present and future earning capacities," noting that the plaintiff had testified that she could earn $50,000 a year. *Id*. at 720. The *Berger* Court further noted that the court had found that both parties had the financial ability to support the children when it made its child-custody determination. *Id*.

In contrast, the record in this case does not support that the parties have equal earning capacities. Accordingly, the decision in *Berger* does not control. Here, the court found that both parties were educated and that they had worked during and contributed to the marriage. Oliver was the primary financial contributor to the marriage, whereas Sandy took on a caregiving role for the parties' four children. The court noted that Sandy's earnings in 2022 were approximately $2,000 and that she had no earnings in 2023. Further, although she had a bachelor's degree and a pharmacy technician certificate, she had not finished her training to become a licensed pharmacy technician. Her work history was limited to sporadic substitute teaching and a training period at a pharmacy. Sandy was unable to use her biology degree in the United States. Her earnings capacity, therefore, was limited by her work history and her inability to use her education to obtain paying work.

In contrast, Oliver was employed as an engineer at the Ford Motor Company. He earned between $108,000 and $110,000 in 2022, which is approximately 98% more than Sandy made in the same year. The court noted that Oliver was on track to earn $108,203 in base salary for 2023. Moreover, based upon income information submitted to the Friend of the Court for purposes of calculating child support, the court found that Oliver's gross income for 2023 would be closer to $166,000. Overall, the disparity in the parties earnings' capacities is a factor that supports the court's unequal division of the marital property.

The court also found that Oliver was at fault for the breakdown of the marital relationship. Specifically, the court found that Sandy had been the victim of physical and emotional abuse by Oliver and that the abuse had lasted for years. The court found that Oliver had three recent domestic-violence convictions and a stalking conviction. Sandy was the victim of Oliver's domestic violence and stalking. Additionally, Oliver violated a PPO order. The court found that, despite the PPO and multiple no-contact orders entered in his criminal cases, Oliver "remains a threat and has continued to harass" Sandy. In its findings of fact, the court noted that Oliver had been arrested for domestic violence on two other occasions, but that the charges had been dismissed when Sandy failed to appear. The court also cited testimony from Oliver indicating that he had called law enforcement against Sandy multiple times, including while the parties were in court for pretrial matters and while the divorce hearing was proceeding. As noted above, the court found that Oliver's "repeated calling of the police to report [Sandy] as an unsafe mother and seeking welfare checks of the minor children, all because he did not receive his phone call, evidence clear attempts to manipulate the system in his favor (especially given the long lapses of time between the incidents and when he actually called the police)." The court credited Sandy's testimony that the calls were harassing and a significant source of stress for her. In contrast, as noted above, the court did not credit Oliver's testimony that he was the actual victim of domestic abuse, including his claim that Sandy pushed and spat at him and that she pointed a gun at him.

In sum, the court considered Oliver's fault in causing the breakdown in the marital relationship as part of its decision to divide the assets unequally. But the court did not just consider his past fault. Rather, the court found that Oliver "continues to harass and file false police reports" against Sandy and that he would "continue to do so, despite the terms of his probation and the PPO issued by" the trial court. We conclude that the court's consideration of Oliver's fault in causing a breakdown in the marital relationship and his ongoing harassment of Sandy is a factor that supported the court's decision to award a larger share of the marital estate to Sandy.

"In dividing the marital estate, a judge's role is to achieve equity, not to 'punish' one of the parties." *Berger*, 277 Mich App at 722 (quotation marks and citation omitted). Here, Oliver argues that the only factor supporting the court's decision to award an unequal share of the marital assets to Sandy was his fault. However, the record plainly reflects that it was his fault in causing the breakdown in the marriage, his ongoing harassment of Sandy (which included multiple calls to the police to report her for wrongdoing), and the existing disparity in the parties' earnings capacities. Given the entire record, the court's decision to divide the marital assets 57/43 in favor of Sandy was not inequitable.

Affirmed. Sandy may tax costs as the prevailing party. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock