# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DERRYL WADE SHELTON,

      Defendant-Appellant.

UNPUBLISHED
November 27, 2018

No. 337796
Washtenaw Circuit Court
LC No. 15-000590-FC

Before: MURPHY, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

A jury convicted defendant of one count each of first and second-degree criminal sexual conduct (CSC) in violation of MCL 750.520b(b)(*i*) and MCL 750.520c(b)(*i*), for the sexual touching and penetration of his 15-year-old ward. Defendant challenges his convictions on various grounds, none of which have merit. We affirm.

## I. BACKGROUND

Defendant and his wife, Shantay Shelton, brought 15-year-old PW into their home in January 2015. PW had been removed from her mother's care as a toddler; her father was unable to care for her because he was disabled and lived in a nursing home. PW and her younger sister moved in with their older sister, Dana, who was 53-years-old at the time of the trial. Dana terminated her guardianship over PW in 2014 due to disciplinary issues.

Virgil and Velicia Humes became PW's guardians. Virgil Humes was the pastor at the church PW attended. PW moved out of the Humeses' home when they confronted her about behavior problems. The Sheltons attended the Humeses' church and agreed to take over as PW's guardians. Defendant had been a Detroit police officer for 22 years and Shantay owned a hair salon.

PW alleged that in early April 2015, Shelton sexually abused her. She asserted that on April 2, 2015, defendant drove her to school, told her that he loved her and that there were certain things they did that would make Shantay jealous and had to be kept secret. Defendant later picked up PW from school and drove her home. PW described that she came into Shelton's bedroom and asked if she could use his old cell phone to message friends. Shelton agreed and PW sat on the bed. PW recounted that Shelton went into the bathroom and returned wearing only underwear. Defendant then pulled down PW's underwear and performed cunnilingus while

-1-

she continued text messaging friends on the phone. After a few minutes, PW asked Shelton to stop and she left the room. PW went into the bathroom and took a selfie in the mirror. PW later claimed that she was trying to act normally and to forget the abuse, and thought taking a selfie would help. Shortly after the first alleged assault, Shelton and PW drove to church to attend choir practice. At practice, PW told her friend KA about the incident, but instructed her to tell no one.

A couple of days later, PW contended, Shelton came into her room while she was sleeping. Defendant showed PW a website that stated that a girl's first love should be her father. Shelton then allegedly put a hand inside PW's pants and "squeeze[ed]" her butt.

On a third occasion, PW testified that she came home early from school because she was sick. PW claimed that defendant rubbed Vicks Vapor Rub on her chest. PW memorialized this event in her diary.

At some point, PW told KA that defendant had touched her again. KA convinced her mother to call PW, and the mother urged PW to report the abuse to Shantay. Shantay responded by taking PW to the Humeses' home, a "safety plan" the Sheltons had in place given PW's troubled past. Shantay admitted that she did not believe PW's accusations. Velicia Humes contacted a friend who had worked for Child Protective Services. This individual advised Velicia to take PW to the hospital in the morning.

Velicia took PW to the hospital on April 9, 2015. The emergency room doctor who attended to PW did not conduct a sexual assault examination as the alleged assaults had occurred more than 72 hours earlier. But the hospital did contact the police.

Several weeks later, the prosecutor filed a felony complaint charging defendant with the two crimes of conviction and obtained an arrest warrant. Defendant voluntarily appeared in district court, with counsel, and a bond was set. Defendant posted bail and was not taken into custody. Subsequently defendant was arraigned on the felony information in circuit court; a transcript of the arraignment has not been provided to us. Defendant was never formally arrested and was not placed in custody until after his conviction. He was represented by retained counsel from the outset of the prosecution.

## II. IMPEACHMENT BY SILENCE

Defendant first contends that the prosecutor invaded his constitutional rights by repeatedly questioning him about his decision not to speak to the police during the investigation.

Defendant took the stand to testify in his own defense. On cross-examination, the prosecutor repeatedly questioned defendant about his failure to speak to the police:

> *Q.* Now, you've been a Detroit Police Officer for how long?
>
> *A.* 22 years.
>
> *Q.* So you have probably investigated a lot of cases, correct?

-2-

*A*. No, I was a foot soldier. I didn't do any investigation.

*Q*. So you were a police officer rather than a detective, is that what you're saying?

*A*. Yes.

*Q*. Okay. So as soon as this allegation comes out, you didn't call the police, correct?

*A*. No.

*Q*. And did you think it might be important to call the police?

*[Defense Counsel]*. Objection. Your Honor, for the same reason that I stated earlier on the record on side bar.

*The Court*. Over-ruled.

*Q*. Did you think it might be important to call the police?

*A*. Well, I knew what course of events were going to occur.

*Q*. So your decision, at that point, immediately was to contact the Humes and have a conversation with them, correct?

*A*. No, that was my wife's decision. I didn't know anything about that. She did that on her own.

*Q*. Okay. So . . . you didn't discuss anything with the Humes that night as soon as you learned of the disclosure?

*A*. Personally, I didn't, no. She had taken her off to [the Humeses'] house. I never got a chance to even ask her, what are you talking about. They took her off to Pastor's, and I knew that they were going to do what was necessary, so there was no need for me to do anything.

*Q*. But they didn't correct?

*A*. Yeah, they did.

*Q*. They contacted law enforcement?

*A*. Well, . . . they went to the hospital and . . . normal reaction for that with those kind of allegations, they call the police.

*Q*. The hospital calls the police?

*A*. Yes.

*Q.* But the Humes[es] never did? I mean, 24 hours passed.

*A.* I don't know what they did. I just know that procedure is you go to the hospital, they're gonna call the police.

*Q.* Well, usually when a law enforcement officer is aware of a crime or an allegation of a crime, or as you're saying, a false report of a crime, you would call the police, correct, because you would want that investigated right away, correct?

*A.* Not necessarily.

*Q.* And you might want that investigated before all the witnesses got together and had an opportunity to speak to each other, correct?

As a law enforcement officer, you're saying it's not important to talk to witnesses before they all speak to each other?

*A.* How was I to know that they were going to do that?

* * *

*Q.* Did you ever think of contacting the police and telling them you[r] side of the story?

*[Defense Counsel].* Same objection, your Honor. Continuing objection as to anything along these lines about what my client said or did as it relates to law enforcement.

*The Court.* Over-ruled.

*Q.* Did you ever call law enforcement and tell them your side of the story?

*A.* I didn't call, but I spoke with the detective.

*Q.* When did you speak with the detective?

*A.* I don't remember the date.

*Q.* And you gave him a statement?

*[Defense Counsel].* Continuing objection.

*Q.* Did you ever give Detective Boivon a statement or did you tell him you wouldn't speak with him?

*A.* Well, the first attorney that I had advised me that I didn't need to speak to anyone, and then I got another attorney - -

*Q.* Prior to getting an attorney?

*A*. No, I had an attorney.

*Q*. So you have never given your - - as a Detroit Police Officer for, I forgot how many years, you never said I should go tell law enforcement my side of the story?

This case has been pending for over a year-and-a-half, is that correct?

*A*. Yes.

*Q*. And you have never given them any information that you're reporting today?

*A*. Well the fact that I been - -

*[Defense Counsel]*. Continuing objection, your Honor.

*Q*. You can answer the question.

*A*. Oh. Well, the fact that I am in law enforcement, I know how this thing goes. Why . . . would I do that? You would let the chain of events take its course. If he hasn't called me, I'm not gonna call him.

*Q*. And you're saying he never called you?

*A*. When he did, we spoke, yes, and then that's when my attorney first said, well, you don't need to say anything because you haven't done anything. They have to prove the burden of proof. So I was guided by my attorney.

\* \* \*

*Q*. Okay. And again, you didn't think that that might be information that law enforcement would wanna hear prior to a jury trial on a criminal charge?

*A*. Following the guidance of my attorney.

\* \* \*

*Q*. Again, remind me how long you've been a police officer. I didn't write it down. I'm sorry.

*A*. 22 years.

*Q*. And in 22 years, again, it's your testimony of being a police officer, you did not feel it was important to, one, report it, is that correct?

*A*. It wasn't a matter of feeling necessary to report it. I mean, . . . the accusations were being directed towards me. So, naturally, I'm gonna let the courses [sic] of events take its [sic] place.

*Q.* And then second, which kind of leads from what you just said, the accusations are against you, of course you would want your side out there, correct?

*A.* Of course, yeah.

*Q.* Yet you never spoke with Detective Boivon in the past year-and-a-half?

*A.* He never contacted me. We spoke earlier in the . . . beginnings of this, and that was that.

* * *

*Q.* And you first had an attorney on April 24th, correct?

*A.* Well, prior to Mr. Strong.

*Q.* Prior to this attorney?

*A.* Yes.

*Q.* Was April 24th, so there's 15 days there that you had that you could have made your voice heard, correct?

*A.* I guess - -

*Q.* Two weeks?

*A.* Okay. Yes.

On redirect examination, defense counsel clarified that both he and his predecessor advised defendant "not to talk to the police." Defendant affirmed those statements and indicated that he "followed [that] advice."

In closing argument, the prosecutor returned to this theme:

And then what happens? . . . [PW] has to tell [Shantay]. She has to tell the defendant's wife what happens to her. [Shantay] doesn't call the police, even though he's a law enforcement officer for over 20 years, to get a let's start this investigation, let's talk to everyone, let's hammer everything down. No, she goes to the Humes' house.

There's some old saying about circling the wagon[s] or rally the troops. They wanted . . . to get their stories straight. They wanted to talk before this happened.

A day later, they take her to the hospital. The hospital has to report as . . . Mr. Shelton said, that a sexual assault has happened, but they had to do

-6-

something.  But they made sure they knew what was going on for 24 hours before that happened.

A law enforcement officer for over 20 years never speaks with law enforcement, never.  During the entire pendency of the case, for the two weeks that he doesn't have a lawyer.

Defense counsel interrupted the prosecutor's closing to object: "Once again, your Honor, objection as to the prosecutor making reference in her closing argument that my client did not talk to law enforcement."  The court responded:

Let me just say to the jury, obviously, the constitution provides everybody the right to refuse to make a statement, and you can't hold it against the defendant if he didn't make a statement.

I think the prosecutor's point was to try to point out the fact, I don't think the [sic] he wasn't being asked whether he refused to make a statement.  I think she was commenting upon the fact that he did what he did.  So we'll go on from there.

Unfortunately, the legal basis or bases for defense counsel's objections were never placed on the record.  Defendant's appellate counsel moved in the trial court for an evidentiary hearing to create a record in this regard; the trial court denied the motion.

## A. THE CROSS-EXAMINATION

Defendant mounts a three-pronged challenge to the prosecutor's cross-examination, contending that it violated his Fifth Amendment right to be free from self-incrimination, his Sixth Amendment right to counsel, and his Fourteenth Amendment right to due process of law.

Before examining these arguments, we highlight several salient facts.  First, no evidence of record substantiates that defendant was ever formally advised of his right to remain silent under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).  Defendant's appellate counsel concedes that whether defendant was given *Miranda* warnings is unknown and requests that we remand for an evidentiary hearing in this regard.[1]  Second, even if defendant had received *Miranda* warnings when he was arraigned, the prosecution did not use his silence after that point as substantive evidence of his guilt.  The questioning at issue was confined to cross-

---

[1] Defendant first sought an evidentiary hearing regarding *Miranda* in his reply brief on appeal. He has not provided this Court with an affidavit or any other evidentiary proffer suggesting that he was, in fact, formally given *Miranda* cautions.  A defendant seeking a remand for an evidentiary hearing is generally required to support his claim with an affidavit or offer of proof of the facts to be established at a hearing.  MCR 7.211(C)(1)(a).  We decline to order a remand, as defendant has not made the requisite showing.

examination intended to impugn defendant's credibility. As we discuss in greater detail below, the cross-examination did not violate defendant's constitutional rights.

We review de novo whether defendant was improperly impeached with his silence. *People v Clary*, 494 Mich 260, 264; 833 NW2d 308 (2013). The Fifth Amendment "forbids either comment by the prosecution on the accused's silence [at trial] or instructions by the court that such silence is evidence of guilt." *Griffin v California*, 380 US 609, 615; 85 S Ct 1229; 14 L Ed 2d 106 (1965). However, when a defendant testifies voluntarily, he waives his Fifth Amendment privilege against self-incrimination. *Brown v United States*, 356 US 148, 155; 78 S Ct 148; 2 L Ed 2d 589 (1958). This means, of course, that a defendant may be cross-examined regarding issues that bear on credibility: "When a defendant at trial elects to waive his privilege not to testify and takes the stand, attempted impeachment is a time-honored method of advancing the truthfinding function." *People v Collier*, 426 Mich 23, 38; 393 NW2d 346 (1986).

Here, defendant was extensively cross-examined regarding his failure to proactively contact the police to advocate his innocence after he learned of PW's accusation. Defendant's Fifth Amendment challenge to this cross-examination fails because "the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Jenkins v Anderson*, 447 US 231, 238; 100 S Ct 2124; 65 L Ed 2d 86 (1980). *Jenkins* instructs that a defendant's Fifth Amendment rights are not "burdened impermissibly" by impeachment questioning focused on inconsistencies in a defendant's testimony. *Id*. When a defendant testifies, the "interests" of the prosecution " 'and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.' " *Id*., quoting *Brown*, 356 US at 156.

Impeachment predicated on prearrest silence does not violate the Due Process Clause of the Fourteenth Amendment, either. In *Doyle v Ohio*, 426 US 610, 611; 96 S Ct 2240; 49 L Ed 2d 91 (1976), the Supreme Court held that a prosecutor may not "impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." The Court rested its holding on due process principles, finding it "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id*. at 618. But *Doyle* is inapplicable here, as defendant was never arrested and the record is devoid of evidence that he was ever Mirandized.

Nor do alternate due process grounds stand in the way of cross-examination focused on silence. In *Jenkins*, 447 US at 238-239, the United States Supreme Court affirmatively approved impeachment based on prearrest, pre-*Miranda* silence, holding that it does not offend the Due Process Clause. The Court reasoned that

> [c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A Wigmore, Evidence § 1042, p 1056 (Chadbourn rev,

1970). Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative. [*Id.* at 239].[2]

In *Fletcher v Weir*, 455 US 603, 607; 102 S Ct 1309; 71 L Ed 2d 490 (1982) the Supreme Court reiterated that impeachment with a defendant's prearrest silence is not constitutionally objectionable:

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

Therefore, we find no violation of defendant's due process rights.

Defendant contends that the prosecutor's questioning also violated his Sixth Amendment right to counsel, as defendant repeatedly explained that he had not contacted the police or made any effort to exculpate himself on the advice of his lawyer. We have found no case law supporting that the prosecutor's questions denied defendant his right to counsel, and defendant has not cited any. And defendant was represented by retained counsel throughout the proceedings.[3]

Furthermore, the United States Supreme Court has portrayed post-*Miranda* "silence" as encompassing a defendant's insistence on remaining mute until the advice of an attorney has been obtained: "With respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Wainwright v Greenfield*, 474 US 284, 295 n 13; 106 S Ct 634; 88 L Ed 2d 623 (1986). See also *Grancorvitz v Franklin*, 890 F2d 34, 43 (CA 7, 1989) (holding that a defendant's silence resulting from a lawyer's advice "does

---

[2] In the federal courts, "prior silence cannot be used for impeachment where silence is not probative of a defendant's credibility and where prejudice to the defendant might result." *Jenkins*, 447 US at 239.

[3] We *have* found a case endorsing the notion that an attorney's advice to remain silent in the face of accusation is logically equivalent to a formal *Miranda* caution delivered by a police officer or an arraigning magistrate. *Leecan v Lopes*, 893 F2d 1434, 1442 (CA 2, 1990). *Leecan*'s reasoning (which is premised on Due Process rather than Sixth Amendment principles) has not been adopted elsewhere, to our knowledge. Were we free to consider Shelton's counseled silence as commensurate with post-*Miranda* silence, we would hold that the prosecutor contravened *Doyle* by asking Shelton, at least three times, whether he "ever" (or "never") contacted law enforcement to tell his side of the story. The prosecutor's questions clearly encompassed the time period after Shelton was represented and remained silent on the advice of his lawyer.

not automatically transform silence into constitutionally protected silence"). Accordingly, defendant's references to reliance on his attorney's advice as the reason for his silence arise solely under the Fifth Amendment and the Due Process Clause, rather than constituting a potential violation of Sixth Amendment rights.

In sum, we hold that the prosecutor's cross-examination regarding defendant's failure to proclaim his innocence or otherwise talk to the police did not contravene constitutional principles.

## B. THE PROSECUTOR'S CLOSING ARGUMENT

In her closing argument, the prosecuting attorney reiterated the theme she had developed during the trial: the defendant, his wife, and the Humeses sought to cover up what had happened to PW, "circling the wagon[s]" to "get their stories straight" before the police became involved. Regarding defendant in particular, the prosecutor argued:

A law enforcement officer for over 20 years never speaks with law enforcement, never. During the entire pendency of the case, for the two weeks that he doesn't have a lawyer.

Defense counsel objected to this statement, but the record does not include the legal basis for the objection. Nonetheless, we will treat counsel's objection as preserved. Our task is to determine whether the prosecutor's reference to defendant's silence "during the entire pendency of the case" and for the time before he had counsel were improper, and if so, whether the prosecution has established that the error is harmless beyond a reasonable doubt. *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).

In contrast with the cross-examination discussed above, the prosecutor's closing-argument reference to defendant's silence did not merely seek to impeach defendant's testimonial claim of innocence; it invited the jury to infer defendant's guilt based solely on his silence. Admittedly, in this case, the line between substantive and impeachment uses of a defendant's silence is finely drawn. During cross-examination, the prosecutor's questions encouraged the jury to disbelieve defendant based on his failure to tell his side of the story when he had an opportunity to do so. In closing, however, the prosecutor more directly suggested that defendant was guilty because he elected to remain silent.

The United States Supreme Court has not yet addressed whether "the use of prearrest silence as substantive evidence of guilt violates the Fifth Amendment." *Combs v Coyle*, 205 F3d 269, 281 (CA 6, 2000). In *Combs*, 205 F3d at 283, the Sixth Circuit joined several other federal Courts of Appeal, holding that "the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination." However, in *People v Schollaert*, 194 Mich App 158, 167; 486 NW2d 312 (1992), this Court held that the use of a defendant's prearrest silence as substantive evidence does not contravene the Constitution. We are bound by *Schollaert*. Further, even if impermissible, the prosecutor's closing argument was harmless beyond a reasonable doubt.

In response to defense counsel's objection, the trial court informed the jury that "obviously, the constitution provides everybody the right to refuse to make a statement, and you

can't hold it against the defendant if he didn't make a statement." Because the prosecutor's potentially inappropriate use of defendant's silence was limited to a brief portion of her closing argument and because the trial court immediate informed the jury that it could not use the silence as proof of defendant's guilt, any error was harmless beyond a reasonable doubt.

### III. BOLSTERING OF THE COMPLAINING WITNESS

Defendant next argues that he was denied a fair trial by the prosecutor's elicitation of improper bolstering testimony through Detective Tom Boivin, the lead investigative officer. Boivin observed PW's forensic interview. In response to the prosecutor's questions, he agreed that PW had made "allegations consistent with what she had previously said." The prosecutor then attempted to ask Boivin whether PW's diary contained information consistent with her allegations; defense counsel objected on hearsay grounds, and the trial court sustained his objection. Defendant further contends that the prosecutor's examination of Boivin generally bolstered the prosecution's case by highlighting "irrelevant" information about the "integrity and intricacies of the investigation process[.]"

"It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). A witness "may not vouch for the veracity of a victim." *Id*. Nor may a prosecutor "vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness'[s] truthfulness," either through questioning or during argument. *People v Bahoda*, 448 Mich 261, 276, 531 NW2d 659 (1995).

Boivin's testimony regarding the mechanics of the investigation was simply not "bolstering." Rather, Boivin supplied background information placing in context the actions taken before defendant was charged. This testimony may have indirectly enhanced Boivin's credibility, but it did not bolster PW's testimony.

The prosecutor's question regarding the forensic interview and its consistency with PW's prior statements elicited inadmissible hearsay. Defense counsel did not object. On plain error review, defendant has not established that this single, isolated question and answer affected his substantial rights. See *Carines*, 460 Mich at 763.

### IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, defendant contends that his counsel performed ineffectively and that the trial court erred in denying his motion for a *Ginther* hearing.[4] He also requests that we remand for a hearing before reaching our opinion. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo." *People v Cline*, 276 Mich App

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

634, 637; 741 NW2d 563 (2007). We review a trial court's decision whether to hold an evidentiary hearing for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*. at 217.

We must begin our analysis by assuming that counsel performed effectively. *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). "To prove a claim of ineffective assistance of counsel, a defendant must establish that counsel's performance fell below objective standards of reasonableness and that, but for counsel's error, there is a reasonable probability that the result of the proceedings would have been different." *Id*. The defendant also must overcome the presumption that counsel's decisions were sound trial strategy. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Counsel enjoys great latitude in matters of trial strategy and tactics. *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994). That a defense strategy ultimately fails does not establish ineffective assistance of counsel. *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

We need not remand for an evidentiary hearing before considering defendant's challenge to his counsel's performance. A *Ginther* hearing is only required when "there is a factual dispute" underlying the defendant's challenges. *People v Bauder*, 269 Mich App 174, 194; 712 NW2d 506 (2005). Where there are no factual disputes, and when the existing record is adequate to consider the defendant's claims, a remand is unnecessary.

Defendant first contends that defense counsel was ineffective for failing to call two witnesses at trial. One of the witnesses, Velecia Humes, would have called into question PW's credibility, and the other would have testified that the decision to wait a day before taking PW to the hospital was consistent with CPS procedures. Defense counsel did subpoena Velecia, but did not present her testimony. Therefore, he was clearly aware of her proposed testimony and simply chose not to call her.

Decisions regarding whether to call or question witnesses are presumed to be matters of trial strategy. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (quotation marks and citation omitted). "A failed strategy does not constitute deficient performance." *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

Defense counsel's failure to call the two witnesses did not fall below an objective standard of reasonableness. Counsel was aware of the witnesses, the testimony they could offer, and evidently elected against presenting evidence focusing on the events that occurred after the alleged abuse was reported. Neither witness would have addressed whether defendant did, in fact, abuse PW, and calling them would have allowed the prosecutor to delve even more deeply into the prosecution's "cover-up," "circling the wagon[s]" theory. Defendant has not shown that failure to call either of these witnesses resulted in a violation of his constitutional right to present a defense. See *Chapo*, 283 Mich App at 370.

Next, defendant argues that his counsel was ineffective for failing to impeach PW concerning certain prior inconsistent statements. Decisions concerning the cross-examination and impeachment of witnesses are matters of trial strategy. See *People v McFadden*, 159 Mich App 796, 800; 407 NW2d 78 (1987). In addition, defense counsel's failure to impeach a witness on all contradictory prior statements does not constitute ineffective assistance of counsel. See *id*. "Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

Here, defense counsel did impeach PW on some of her prior inconsistent statements on cross-examination. Defendant has not shown that other points of impeachment, such as defendant's alleged additional statements or whether PW was wearing basketball shorts or a dress during the first assault, would have aided his defense that PW fabricated the allegations. Thus, defendant has not shown that counsel was deficient for this reason. See *McFadden*, 159 Mich App at 800.

Finally, defendant asserts that defense counsel was ineffective for failing to object to the detective's testimony that PW's allegations were consistent and how the investigation progressed. As discussed above, this testimony was not improper. "Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion." *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

Moreover, defendant has failed to establish that absent defense counsel's alleged errors, the outcome of his trial would have been different. See *Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000). After hearing all the testimony at trial, the jury found PW's testimony regarding the sexual assaults credible even after rigorous cross-examination and character testimony indicating that she was a liar who could not be trusted. Her testimony was enough to establish the offenses of CSC-I and CSC-II. Therefore, defendant did not show that defense counsel was ineffective. See *id*. Accordingly, the trial court's decision to deny defendant's motion for a new trial was not an abuse of discretion. See *Unger*, 278 Mich App at 216-217.

We affirm.

/s/ William B. Murphy
/s/ Elizabeth L. Gleicher
/s/ Anica Letica